IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) ALISON CLARK, | ) | |
| (2) M.C., | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. |
| (3) CANTON INDEPENDENT SCHOOL DISTRICT No. 105 of BLAINE COUNTY, OKLAHOMA, a.k.a. CANTON PUBLIC SCHOOLS, a.k.a. CANTON SCHOOL DISTRICT; | ) | |
| (4) SEAN WEIBLING, individually; | ) | |
| (5) MARISA EVANS, individually; | ) | |
| Defendants. | ) | |

**COMPLAINT- JURY TRIAL DEMANDED**

COMES NOW, Alison Clark and M.C., Plaintiffs, by and through their attorneys of record Stephen Jones, William Jewell and Blake Trekell, of JONES, OTJEN, and JEWELL, and for their causes of action against the Canton Independent School District No. 105 of Blaine County, Oklahoma, a.k.a. Canton Public Schools, a.k.a. Canton School District, Sean Weibling, individually, and Marrissa Evans, individually, alleges and states as follows:

## I. PARTIES

1. Plaintiff Alison Clark is the mother of M.C. Alison Clark was at all relevant times and is currently domiciled and a resident of rural Blaine County, Oklahoma. Blaine

County is within the jurisdiction of the United States District Court for the Western District of Oklahoma. Alison was previously, and at the time of the majority of the facts and allegations made herein, employed in some capacity by the Defendant, Canton Independent School District No. 105 of Blaine County, Oklahoma (hereinafter referred to as the “Canton Public School” or “School”). Alison was a veteran employee employed by the Canton Public School since August of 2018 teaching in the Music program. She was highly qualified in her position, holding a Bachelor of Arts degree in music from the University of Delaware and a Master of Education degree from Wilmington University. Alison was accomplished within her program. Her students excelled and were accomplished and competitive among their peers. Alison had a clean disciplinary record within the Canton Public School prior to the allegations described contained herein.

2. M.C. is the daughter of Alison Clark. M.C. was at all relevant times and is currently domiciled and a resident of rural Blaine County, Oklahoma. Blaine County is within the jurisdiction of the United States District Court for the Western District of Oklahoma. M.C. was a Junior and a top contender for valedictorian in her class at Canton Public Schools prior to the avoidable circumstances described and contained herein. M.C. was a high achieving student both academically and in extracurricular activities, even while struggling with the effects of Sensory Processing Disorder and Apraxia of Speech since childhood.

## II. JURISDICTION AND VENUE

3. Plaintiffs incorporate the above and foregoing facts and statements as if fully stated herein.

4. Jurisdiction is proper in this Court as all parties are domiciled within the State of Oklahoma and the Western District of Oklahoma.

5. Venue is proper in this Court as all defendants reside within the Western District of Oklahoma and are all residents of the state of Oklahoma and a substantial part of the events or omissions giving rise to the claim occurred within the Western District of Oklahoma. 28 U.S.C. § 1391(b)(1) and (2).

6. This Court has subject matter jurisdiction over the claims being asserted under federal question and supplemental jurisdiction. 28 U.S.C. §§ 1331, 1367.

7. Plaintiffs have satisfied the notice requirements and are within the time parameters in accordance with the Oklahoma Governmental Tort Claims Act for the applicable Oklahoma state law claims. 51 O.S. § 156(B).

## III. FACTS

8. Plaintiffs incorporate the above and foregoing facts and statements as if fully stated herein.

9. M.C., then a junior at Canton High School, was in a dating relationship with a fellow student, C.S., who was then senior at Canton High School, attending class inside the same building and in close proximity to M.C. at the small rural school.

10. C.S. was a football player at Canton High School, coached by a relative, who believed he was a likely contender for an athletic scholarship at a nearby state

university. C.S. had several family members who either currently worked for or had worked for or had association with Canton Public Schools

11. M.C. was under an individualized education plan (IEP) with Canton Public Schools, having been diagnosed with Apraxia of Speech and Sensory Processing Disorder since her childhood. M.C. would, at times, struggle to effectively communicate verbally in certain circumstances as a result.

12. Throughout their dating relationship C.S. made threats of harm to M.C. towards himself, M.C.'s family, close friends and others at Canton High School, both in person and through text messages.

13. This behavior finally came to a head one day during a dispute over a video game at M.C.'s home which resulted in C.S. making threats towards M.C.'s siblings and friends as a result. Once her parents were involved, M.C. made several disclosures.

14. The text messages also portrayed a verbally abusive and manipulative relationship with C.S. as the aggressor. C.S. attempted to manipulate M.C. by targeting her associates through threats of violence towards those individuals if he disapproved of M.C.'s association with them. M.C., feeling helpless against C.S. at times, would implicate her father, who was unaware of the abuse, in messages to C.S. at times in an effort to try and insert a greater authority into the conversation to counter C.S.'s extreme positions.

15. The various statements made by C.S. threaten great bodily harm and death to others and himself and are primarily for the purpose of manipulating and controlling M.C.'s emotions and behavior. Some of the threats made by C.S. were homophobic

threats, like threatening another student because of his perceived sexuality. During those messages C.S. worked to convince M.C. that she too was actually homophobic and hated this boy because of his perceived sexuality as well.

16. In other messages C.S. boasts about violence he has already committed towards people in the past, lending credibility to his threats. There are dozens of pages of violent threatening texts that M.C. was subjected to by C.S., of which Canton Public Schools were in possession of during their response to the circumstances involving C.S. and M.C.

17. One of the several series of text conversations read:

> M. C.: I'm sorry about [D.]. and what happened today. Tomorrow is a new day and you don't have to deal with [D.].
>
> C. S.: Just please don't ever spend time with him again because if he's with you next time I'm around then I will probably beat him to a bloody pulp.
>
> M. C.: If he comes to me, I'll just give him a cold shoulder then.
>
> C. S.: Ok thanks because if that doesn't happen then he'll most likely die.
>
> M.C.: But if that doesn't work, don't punch him and stuff like that.
>
> C.S.: Can't promise I won't.
>
> C.S.: He better stay away from you or else.

Still talking about M.C. associating with her male friend C.S. stated:

> C.S.: I'm just saying that you shouldn't be around him because he's not a very good guy to be around. Plus, when I see you so happy with him it makes my soul die and makes me want to die or hurt him really badly.
>
> M.C.: Okay, my dad wants to know why you're mad or whatever else when you see me happy around him and [K.].

> C.S.: It's because it makes me feel like I don't do enough to make you happy at all. Also, my self esteem is terrible so that adds onto it.

18. C.S. would become angry anytime that M.C. appeared happy around other people because he did not feel like he was doing enough. His solution? Rather than doing more he expected M.C. to not hang around anyone else that made her appear happy. More of C.S's jealous messages, trying to guide M.C. into playing a specific role and part in one of his jealous exchanges reads:

> C.S.: Trust me, my anger issues can be really bad. If he's making you so happy and I'm not then either I'll start beating my head against a wall somewhere or I will start beating him up.
>
> M.C.: You definitely haven't seen what went down with [K.]. He's not, I just hang around him so I won't be depressed and every time I'm with him, I'm honestly two faced.
>
> M.C.: Just like how you are with your friends.
>
> C.S. If it looks like you're happy to me when you're spending time with him then I'll probably go crazy and start beating my head against a wall and possibly crying in a corner.
>
> M.C.: [C.], there is no need to do that because I don't do that when you're two facing with your friends. All you have to do is just go over and take me away then.
>
> C.S.: If I'm wanting to hurt myself then you'll most likely have to walk over to me because it's really hard to prevent myself from hurting myself.
>
> M.C.: I don't know how to see you wanting yourself like signs.
>
> C.S.: If I start walking to the bathroom then that means I'm either using it for it's intended purpose or to beat my head against the wall.
>
> M.C.: Well, I can't follow you into the bathroom.
>
> C.S. But you could grab my arm and ask me if I'm okay.

Still on the issue of seeing M.C. associating with other people, C.S. corresponded:

> M.C.: You looked really happy today.
>
> C.S.: I didn't feel happy deep down inside my heart.
>
> C.S.: On Monday after spring ball, then I'll see if I can come over.
>
> M.S.: I'm sorry, so you were two facing it today.
>
> C.S.: Seeing you so happy with [D.] made me so mad and want to break every bone in his body.
>
> M.S.: To me, today, you looked really happy spending time with other people, I couldn't sense anger in you.
>
> C.S.: Just please don't hang out with him anymore because it makes me so mad and it makes me want to hurt myself.

The previous messages above were clearly related to their romantic relationship and meant to manipulate M.C. in that relationship through threats of violence. One other series of messages reads:

> C. S.: Yeah I'm honestly homophobic.
>
> M. C.: I could tell but I also don't like it either.
>
> C. S.: Yeah I despise gay people.
>
> M. C.: I don't know if I'm considered homophobic because I really don't like them but some of my friends are gay.
>
> C. S.: If its because their (sic) gay that you hate them and you hate what they do then that would be completely homophobic.
>
> M. C.: I don't hate my friends, I just don't agree with what they are doing.
>
> C. S.: So half homophobic.

M. C.: If you want to call it that.

C. S.: I'm 100% homophobic

M. C.: I just do what the Bible says: "Love the sinner, not the sin."

Yet another series of messages reads:

C.S. [C.D.] made us have to run so much and tomorrow at football practice. I'm going to kill him.

M.C. Dang that sucks.

M.C. Please don't.

C.S. Not literally but I mean that I'm going to hit him so hard that he cries just like yesterday.

M.C. What happened yesterday?

C.S. I just hit him so hard that he flopped over and cried.

M.C. Dang, he must've done something stupid.

C.S. He is very cocky so I hit him hard to teach him not to be so cocky.

Approximately one hundred fifty **(150) pages** of similar messages exist.

19. On or about August 21, 2024, an emergency protective order was applied for on M.C.'s behalf after her parents learned of the abuse in their relationship. The emergency order was granted through the Blaine County District Court and a hearing was set.

20. Before the final hearing on the protective order unqualified employees of the Canton Public Schools diagnosed C.S. as having a mental health condition that could be attributed to his behavior. The employee was not qualified to make a final diagnosis

and this diagnosis was not observed or accommodated for by Canton Public Schools but was likely made as a favor to offer a defense for C.S.'s behavior, who had family employed with Canton Public Schools and other close family who was extremely influential within the school and its administration.

21. This diagnosis was heavily relied upon by the Blaine County District Court in denying the final protective order against C.S. This reliance, along with misrepresentations made by employees of the Blaine County Court Clerk's Office to M.C.'s family concerning the need for an attorney at the hearing, resulted in their going unrepresented and not being able to admit key evidence and testimony for the court to consider, while C.S. brought an attorney to the hearing, The permanent order against C.S. was denied.

22. C.S. was, however, charged criminally as a juvenile in Blaine County District Court for the threats contained within the aforementioned conversations that were documented in text.

23. C.S. was temporarily suspended from the Canton Public Schools after the text messages were revealed. This came with assurance from the Superintendent Weibling to Alison Clark that if C.S. were to be readmitted the family would be formally notified by the Superintendent before his readmission.

24. A purported "threat assessment" was conducted. On knowledge and belief certain information was intentionally withheld from the threat assessment team. Without formal notification C.S. was able to return to school where M.C. would have to interact

with him and be in close proximity to him while trying to learn and maintain her current academics and prospective status as class valedictorian.

25. Policy of the Canton Public Schools would have allowed C.S. to be kept off the Canton Public School's campus or, alternatively, would have allowed M.C. to attend school remotely from home. Either arrangement would have caused either student's instructors to have to take on extra work to make accommodations for those learning arrangements, extra efforts the administration was not willing to take to protect the safety of their students.

26. M.C.'s mother, Plaintiff Alison Clark, was a highly qualified employee of Canton public schools, with a nearly flawless disciplinary record and a strong performance record concerning her own performance and the performance of her students in the music program she taught and led. Alison began strongly and zealously advocating for her daughter after seeing that the school was shirking their responsibilities towards her.

27. Alison retained counsel after observing that her daughter's safety and rights were being disregarded and overlooked.

28. C.S.'s grandfather appeared at a school board meeting and made public comments to the board and attendees accusing Alison and other employees of lying about his grandson's conduct and urging the board to target her employment with the school. During the tirade, C.S.'s grandfather invoked his close family ties and relationship to the history of the school.

29. Due to pressure from his influential local family and supporters, C.S. was allowed back to attend school in person, most likely so he would be allowed to play football and not harm any of his scholarship prospects. This was allowed despite Alison being advised that C.S. would not be allowed to attend in person if he was charged with a crime in relation to the threats made to M.C. C.S. was charged. Nevertheless, C.S. was readmitted without any formal notification of M.C.'s parents that he would be readmitted as assured by Superintendent Weibling. M.C. simply saw him in school one day after his readmission.

30. As a result, M.C. was immediately withheld from school by Alison and her father until accommodations could be made to have M.C. in a safe and productive learning environment, which they considered to be virtual from home under the circumstances, which Canton School's policy would have allowed.

31. The School did not budge or accommodate. These absences, while M.C.'s parents attempted to work out accommodations with the School, were counted against M.C. In fact, Alison received a letter from Canton Public Schools threatening truancy consequences if M.C. did not return to in-person learning at the school. The same school C.S. was now attending with pending criminal charges against him, of which M.C. was the key witness, victim and former dating partner of C.S., who had made explicit threats to kill other students for behavior less intrusive upon him than the charges he was currently facing.

32. Immediate requests were made for M.C. to be placed in an off-campus learning environment. These requests were denied. Instead, then, Alison called for an

emergency IEP meeting to request accommodations for M.C. Her IEP team assembled, along with counsel for the School and counsel for M.C. and her family.

33. The Principal, Defendant Marisa Evans, who was both assistant principal for Canton High School and M.C.'s math teacher, was present for the team evaluating M.C.'s new IEP. The assistant principal smirked and was lighthearted throughout the majority of the meeting. At one point the administrator in attendance had to urge the assistant principal to adhere to the accommodations, of which he never gave complete assurance that he would, appearing prideful of his staunch position. Not surprisingly, M.C. struggled disproportionately in his class, not being given the proper agreed to accommodations.

34. M.C. was given quasi accommodation to separate her from C.S., which were anecdotal and did not end up being effective.

35. During the meeting it was agreed that M.C. would be given a closet that the school had tidied up for M.C. to seek refuge in if she found herself in a mental health crisis and needed a private place to regroup. The arrangement failed and that closet became more of a humiliating space for M.C. to suffer alone in her trauma, which would later develop into a serious potentially life-long neurological condition.

36. M.C.'s mental and physical health deteriorated due to the trauma from her circumstances. Her proven record of success academically suffered as a result. Not only was she suffering the trauma from what she had been through in her abusive relationship, but was facing the reality that her school would not protect her and was forcing her to be in close proximity to her offender in the circumstances. The School's staunchness became

so unreasonable that after qualified medical professionals recommended that M.C. not be on campus and placed in a virtual learning environment, the School attempted to place M.C. in a different building among administration and other employees of the school that had brought M.C. into her current circumstances. This resulted in the school becoming engaged in a disagreement over the word "campus," requiring the medical professional to have to send another follow-up letter to the school defining campus. As used, and under the common definition, the word "campus" excluded the arrangement that the School had tried to make for M.C. after this letter was sent.

37. Alison continued to advocate through principal Defendant Marisa Evans and others for M.C. and insist that the agreed upon accommodations were adhered to. They were not. Instead, Alison was ostracized, harassed and retaliated against for advocating for her daughter. Alison's colleagues, who she was once close with, refused to speak or associate with her for obvious fear they would become involved and receive the same retaliation. Alison was sanctioned and counseled formally concerning her performance multiple times, without cause and for actions which were previously acceptable, tarnishing her otherwise impeccable performance and disciplinary record, clearly attempting to create a pretext to have her terminated.

38. Alison's performance evaluation for the 2024-25 school year however, on paper, found her to be "highly-effective" as the junior/senior high music teacher.

39. Despite this, and Alison's award winning and highly effective program and her popularity among students and parents, the School, led by Defendants Sean Weibling

and Marisa Evans, decided that they would demote Alison and fill her position with someone else.

40. Alison did not learn of this decision from school administration, but instead learned of the decision after she saw her job posted to the school's social media account seeking to fill her position. This was undoubtedly in an effort to get Alison to leave on her own and avoid the school having to terminate her.

41. Alison was demoted to a noncompetitive teaching position at the grade school level. A position that Alison was highly overqualified for and was meant to insult her.

42. The pretext for Plaintiff Alison Clark's demotion was the School's desire to make its' high school music program more competitive. This was the stated reason even though Alison's students were always highly competitive, and often placed high in competitions.

43. Citing the desire to make the program more competitive, the School hired a recent college graduate who was uncertified and had no teaching experience to fill her position. This directly contradicted any notion that their efforts were to make the School's highly accomplished program more competitive.

44. As a result of the clear retaliation against her, and her being unable to continue to put herself in that environment as her own mental health was deteriorating, Alison resigned from Canton Public Schools. She subsequently continued to struggle in her mental health from what the school had forced her to endure, watching her daughter

struggle and be overlooked, or oftentimes being affirmatively targeted and harassed because of her advocacy for M.C..

45. M.C.'s health has continued to deteriorate as well. M.C. developed a neurological condition which caused seizures that, as M.C.'s neurologist would later describe them, M.C. would "have episodes of unresponsiveness, [collapse] to the floor, drooling, kicking, beating her head on things, being unable to speak for hours to days at a time, eye darting movements, hallucinations, and body stiffening and arching to the point that she will balance herself on top of her head and arch like position on the bottom of her feet for minutes at a time." M.C.'s parents purchased her a service dog which was able to sense when she was nearing a seizure. The service dog was trained to alert M.C. and others.

46. M.C. had no history of these seizures prior to the school's conduct. After several trips to the emergency room, both in private vehicles and by ambulance, psychologists, and local doctors, M.C. was referred to a neurologist in Oklahoma City.

47. The neurologist found in support of her diagnosis of M.C. that, "[i]n the fall of 2024, she had a traumatic event through school. She was romantically involved with a student who ultimately made threats of violence towards her, other students, and himself. Once this came to light, he was temporarily dismissed from school but then allowed to return…."

48. The neurologist stated further that "[t]he school has not put an acceptable safety plan in place for her, and was requiring her to continue to attend class and take exams."

49. That neurologist determined M.C.'s "recent events are entirely consistent with a functional neurological disorder, likely due to the acute stress of these threats of violence at school as well as the death of her grandfather". The neurologist further wrote, "I assured them that this is in fact a medical diagnosis, and that she cannot just 'get over it' or stop the activity as has been suggested by her school administrators."

50. To this day M.C. suffers with these episodes. Recently, one such episode occurred in a parking lot in Enid, Oklahoma. During that event M.C. had a seizure in the front seat of Alison's car. It resulted in M.C. placing her feet up in the dash and pushing against the windshield so hard it broke the windshield. Even Enid police, fire, and EMS had to respond to this because M.C. was locked inside the vehicle when this episode occurred and no one was able to get to her to assist her without forcible entry being made into the vehicle. This incident resulted in a hospital stay in Oklahoma City.

51. These medical episodes have become a reality of M.C.'s and her parent/caregiver's daily lives and may be a reality for rest of her life, affecting her future education into college, her employment, and her future happiness and well-being, all as a result of the conduct of the Canton Public Schools and how they handled the abuse of M.C. by C.S.

## IV. CAUSES OF ACTION

### COUNT 1: 42 U.S.C. § 1983 STATE-CREATED DANGER

52. Plaintiffs incorporate the above and foregoing statements and allegations as if fully stated herein:

53. Defendants acted under color of state law at all relevant times.

54. Although the State generally has no constitutional duty to protect individuals from private violence, liability arises when state actors affirmatively create or increase a plaintiff's vulnerability to known private violence. *See DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.,* 489 U.S. 189 (1989); *Armijo ex rel. Chavez v. Wagon Mound Pub. Schs.*, 159 F.3d 1253 (10th Cir. 1998).

55. To invoke the danger-creation theory, a plaintiff must show a state actor "affirmatively act[ed] to create or increases a plaintiff's vulnerability to, danger from private violence." *Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001); *see also Ruiz v. McDonnell*, 299 F.3d 1173, 1183 (10th Cir. 2002). If a plaintiff meets those preconditions, a plaintiff must next demonstrate:

> "(1) the charged state entity and the charged individual actors created the danger or increased plaintiff's vulnerability to the danger in some way;
> (2) plaintiff was a member of a limited and specifically definable group;
> (3) defendants' conduct put plaintiff at substantial risk of serious, immediate, and proximate harm;
> (4) the risk was obvious or known;
> (5) defendants acted recklessly in conscious disregard of that risk; and
> (6) such conduct, when viewed in total, is conscience shocking."
> *T.D. v. Patton*, 868 F.3d 1209, 1222 (10th Cir. 2017) (Quoting other cases).

56. Defendants possessed actual knowledge of at least **one hundred fifty (150) pages** of communications documenting threats of death, serious bodily injury, intimidation, coercive control, and emotional abuse directed by C.S. toward M.C., her family members, and other students.

57. Defendants further knew that juvenile criminal charges had been filed against C.S. arising from the threatening conduct directed toward M.C.

58. Defendants knew that M.C. was the identified victim of C.S.'s conduct and that she was a student receiving special education services pursuant to an IEP due to documented disabilities.

59. Despite possessing actual knowledge of the danger, Defendants affirmatively exercised their authority to increase M.C.'s vulnerability to harm by returning C.S. to campus, failing to provide promised notice of his return, refusing available remote-learning options, refusing available alternative placements, requiring M.C. to continue attending school in proximity to C.S., and threatening truancy consequences if she did not do so.

60. Defendants possessed policy authority to separate the students or provide alternative educational arrangements but deliberately chose not to utilize those options.

61. M.C. was a specifically identifiable victim and member of a limited and definable class known to Defendants.

62. The risk of harm was immediate, obvious, foreseeable, and repeatedly communicated to Defendants by M.C., her parents, counsel, medical providers, and school personnel.

63. Defendants acted with deliberate indifference and conscious disregard for a known and substantial risk of serious harm.

64. Defendants' conduct was conscience-shocking.

65. As a direct and foreseeable consequence of Defendants' actions, M.C. suffered severe emotional trauma, educational harm, physical injury, neurological injury, functional neurological disorder, medical expenses, and other damages.

WHEREFORE, Plaintiff seeks all relief available under 42 U.S.C. § 1983 and the common law.

**COUNT 2: VIOLATION OF TITLE IX, 20 U.S.C. § 1681**

66. Plaintiff M.C. incorporates the above and foregoing statements and allegations as if fully stated herein.

67. Title IX, 20 U.S.C. § 1681 states: "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

68. The United States Supreme Court said "a recipient's deliberate indifference to sexual harassment of a student by another student also squarely constitutes 'discrimination' 'on the basis of sex.'" *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005), *quoting Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, 643 (1999).

69. The conduct described in this case of action falls under the mandates of Title IX as defined in 34 CFR § 106.2:

> "Sex-based harassment prohibited by this part is a form of sex discrimination and means sexual harassment and other harassment on the basis of sex, including on the bases described in § 106.10, that is:...
> (3) Specific offenses…

(iii) Domestic violence meaning felony or misdemeanor crimes committed by a person who:
(A) Is a current or former spouse or intimate partner of the victim under the family or domestic violence laws of the jurisdiction of the recipient, or a person similarly situated to a spouse of the victim;
and…
(iv) Stalking meaning engaging in a course of conduct directed at a specific person that would cause a reasonable person to:
(A) Fear for the person's safety or the safety of others; or
(B) Suffer substantial emotional distress." 34 CFR § 106.2 (Definition of "sex-based harrassment").

70. The United States Supreme Court has stated that "Title IX prohibits sex discrimination by recipients of federal education funding. The statute provides that '[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.' 20 U.S.C. § 1681(a). More than twenty-five years ago, in *Cannon v. University of Chicago*, 441 U.S. 677, 690-93… (1979), 'we held that Title IX implies a private right of action to enforce its prohibition on intentional sex discrimination.'" *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005).

71. Defendant Canton Public Schools receives federal financial assistance and is subject to Title IX.

72. M.C. was subjected to severe, pervasive, and objectively offensive harassment arising from and occurring within the context of her dating relationship with C.S.

73. The harassment included threats of death, threats of serious bodily injury, coercive control, intimidation, emotional abuse, manipulation of M.C.'s personal relationships, and threats directed toward her family and friends.

74. Defendants possessed actual notice of the harassment through parental reports, student reports, documentary evidence, text messages, and the filing of juvenile criminal charges against C.S.

75. Defendants possessed authority to take corrective action to prevent M.C. from being exposed to the harassment and the trauma from its effects but failed to take those measures, and any measures taken were illusory.

76. Despite actual notice, Defendants responded with deliberate indifference.

77. Defendants returned C.S. to campus, refused available alternatives, denied requests for remote placement, implemented ineffective accommodations, and required M.C. to continue attending school in an environment where she remained exposed to the effects of the harassment.

78. Defendants' response was clearly unreasonable in light of the known circumstances.

79. As a result of Defendants' deliberate indifference, M.C. was denied equal access to educational opportunities, programs, and benefits.

80. M.C. suffered educational harm, emotional trauma, physical injury, neurological injury, medical expenses, and other damages.

WHEREFORE, Plaintiff seeks all relief available under Title IX and the common law.

## COUNT 3: TITLE IX RETALIATION

81. Plaintiff M.C. incorporates the above and foregoing statements and allegations as if fully stated herein.

82. Title IX, 20 U.S.C. § 1681, states: "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

83. The United States Supreme Court has held "…retaliation is discrimination 'on the basis of sex' because it is an intentional response to the nature of the complaint: an allegation of sex discrimination. We conclude that when a funding recipient retaliates against a person because he complains of sex discrimination, this constitutes intentional 'discrimination' 'on the basis of sex,' in violation of Title IX." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005).

84. Defendant Canton Public Schools receives federal financial assistance and is subject to Title IX.

85. M.C. engaged in protected activity under Title IX by reporting and opposing sex-based harassment, dating violence, threats, intimidation, and abuse perpetrated by C.S.

86. M.C. participated in investigations, disciplinary proceedings, court proceedings, and school processes concerning C.S.'s conduct.

87. Defendant possessed actual knowledge of M.C.'s protected activities.

88. Following M.C.'s reports and opposition to C.S.'s conduct, Defendant subjected M.C. to materially adverse actions.

89. Such actions included returning C.S. to campus despite known threats, refusing available educational alternatives, denying requested accommodations, refusing remote placement, counting absences against M.C. while accommodations were being sought, threatening truancy consequences, and requiring M.C. to continue attending school in an environment that exposed her to the effects of the harassment.

90. Defendant's actions would deter a reasonable student from reporting sex-based harassment or participating in Title IX proceedings.

91. Defendant's actions were substantially motivated by M.C.'s complaints, reports, and opposition to C.S.'s conduct.

92. The timing of Defendant's actions, together with Defendant's treatment of M.C. following her complaints, support a retaliatory motive.

93. As a direct and proximate result of Defendant's retaliation, M.C. suffered educational losses, emotional distress, physical injury, neurological injury, medical expenses, loss of educational opportunities, and other damages.

WHEREFORE, Plaintiff M.C. requests judgment against Defendant for compensatory damages, costs, interest, equitable relief, and all other relief deemed just and proper.

**COUNT 4: TITLE IX RETALIATION**

94. Plaintiff Alison Clark incorporates the above and foregoing statements and allegations as if fully stated herein:

95. Title IX, 20 U.S.C. § 1681 states: "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

96. The United States Supreme Court has held "…retaliation is discrimination 'on the basis of sex' because it is an intentional response to the nature of the complaint: an allegation of sex discrimination. We conclude that when a funding recipient retaliates against a person because he complains of sex discrimination, this constitutes intentional 'discrimination' 'on the basis of sex,' in violation of Title IX." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005).

97. Defendant Canton Public Schools receives federal financial assistance and is subject to Title IX.

98. Alison, an employee of Canton Public Schools, engaged in protected activity under Title IX by advocating for M.C., reporting sex-based harassment and dating violence, opposing Defendant's handling of the harassment, participating in meetings and proceedings concerning the harassment, retaining counsel, requesting corrective action, and seeking accommodations and protections for M.C.

99. Alison's actions in advocating for her daughter's health, safety, and stable learning environment constituted opposition to conduct prohibited by Title IX and participation in processes intended to address such conduct.

100. Defendant possessed actual knowledge of Alison's protected activities.

101. Following Alison's advocacy and opposition to Defendant's handling of the harassment, Defendant subjected her to materially adverse employment actions.

102. Such actions included heightened scrutiny, unwarranted criticism, professional isolation, disciplinary measures, counseling, demotion, replacement in her position, damage to her professional reputation, and constructive discharge.

103. Despite Alison's highly effective performance evaluations and successful teaching record, Defendant removed her from her position and replaced her under circumstances suggesting retaliatory motive.

104. Defendant's actions would dissuade a reasonable parent, employee, or advocate from reporting or opposing sex-based harassment within the school system.

105. Alison's protected activities were a substantial motivating factor in Defendant's adverse actions.

106. The temporal relationship between Alison's advocacy and Defendant's actions, together with the surrounding circumstances, supports retaliation.

107. As a direct and proximate result of Defendant's retaliation, Alison suffered lost wages, lost employment opportunities, emotional distress, reputational harm, economic losses, and other damages.

WHEREFORE, Plaintiff Alison Clark requests judgment against Defendant for compensatory damages, equitable relief, costs, interest, attorney fees where authorized, and all other relief deemed just and proper.

## COUNT 5: SECTION 504 OF THE REHABILITATION ACT AND COUNT 6: TITLE II OF THE AMERICANS WITH DISABILITIES ACT

108. Plaintiff M.C. incorporates the above and foregoing statements and allegations as if fully stated herein.

109. Defendant Canton Public Schools receives federal financial assistance and is a public entity subject to Section 504 and Title II.

110. "No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency…" 29 U.S.C. § 794.

111. "Program or activity" is defined in part as "a local educational agency (as defined in section 7801 of title 20), system of career and technical education, or other school system…" 29 U.S.C. § 794(b)(2)(B).

112. Further, United States Code allows "[s]ubject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

113. The same Acts establish a private right of actions for victims of discrimination based upon disability as prohibited by the Acts.

114. M.C. is a qualified individual with disabilities, including Apraxia of Speech and Sensory Processing Disorder.

115. Defendant had actual knowledge of M.C.'s disabilities, educational needs, accommodations, and IEP status.

116. Defendant further knew that M.C. was the victim of documented threats and intimidation and that her disabilities made her particularly vulnerable to the educational and emotional consequences of continued exposure to C.S.

117. Medical professionals recommended that M.C. not be required to attend school in the same environment as C.S.

118. Despite such knowledge, Defendant refused reasonable accommodations, including remote instruction and alternative placements that were available under district policy.

119. Defendants failed to consistently implement agreed accommodations and failed to provide modifications necessary to afford M.C. meaningful access to educational benefits.

120. Defendant denied M.C. meaningful access to educational opportunities and services.

121. Defendant acted with deliberate indifference to M.C.'s federally protected rights with regard to her known and documented disabilities.

122. As a direct and proximate result, M.C. suffered educational losses, emotional distress, physical injuries, neurological injuries, and other damages.

WHEREFORE, Plaintiff seeks all relief available under Section 504 and Title II of the ADA.

**COUNT 6: 42 U.S.C. § 1983 FIRST AMENDMENT RETALIATION**

123. Plaintiff Alison Clark incorporates the above and foregoing statements and allegations as if fully stated herein.

124. At all relevant times, Defendants acted under color of state law.

125. The First Amendment protects a public employee's right to speak and petition as a citizen on matters of public concern. *See Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968).

126. The Tenth Circuit has recently held:

> "To prevail on a First Amendment retaliation claim in the public employment context, the plaintiff must establish the following elements: (1) their speech was not made pursuant to their official duties, *Garcetti*, 547 U.S. at 421; (2) their speech was on a matter of public concern, *Connick*, 461 U.S. at 146; (3) the government's interests as the plaintiff's employer in promoting the efficiency of the public services it provides do not outweigh the plaintiff's free speech interests, *Pickering*, 391 U.S. at 568; (4) the plaintiff's speech was a substantial or motivating factor in the adverse employment action taken against them, *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); and (5) the government would not have reached the same employment decision absent the plaintiff's speech, *id*." *Brown v. City of Tulsa*, 124 F.4th 1251, 1267 (10th Cir. 2025).

127. Alison's advocacy concerning student safety, threats of violence within a public school, treatment of a disabled student, compliance with educational laws, and the handling of criminal conduct within the school system constituted speech and petitioning activity addressing matters of serious and substantial public concern.

128. Alison did not engage in such advocacy pursuant to her duties as a music teacher and an employee of Canton Public Schools. Rather, she acted as the parent and legal advocate of M.C., a disabled student and victim of threats and abuse.

129. Alison repeatedly communicated concerns to administrators, participated in IEP proceedings, retained counsel, advocated for accommodations, challenged the district's handling of M.C.'s circumstances, and petitioned governmental entities for relief.

130. Defendants were aware of Alison's protected activities.

131. Following Alison's advocacy, Defendants subjected her to escalating scrutiny, criticism, counseling, disciplinary actions, professional isolation, and adverse treatment not previously imposed during her successful career with the district.

132. Alison's colleagues ceased associating with her due to the hostile environment created by Defendants.

133. Despite Alison receiving a "highly effective" performance evaluation, Defendants removed her from her secondary music position, publicly sought applicants to replace her before informing her of the decision, and demoted her to a position for which she was substantially overqualified.

134. Defendants asserted that the demotion was intended to make the music program more competitive while simultaneously replacing Alison, who held a Bachelor of Arts degree in music from the University of Delaware and a Master of Education degree from Wilmington University and a proven track record, with an inexperienced and uncertified recent college graduate.

135. Alison's protected speech and petitioning activities were substantial and motivating factors in Defendants' adverse actions.

136. Defendants' stated reasons for their actions were pretextual.

137. As a direct and proximate result of Defendants' retaliation, Alison suffered lost income, lost employment opportunities, emotional distress, reputational harm, and other damages.

WHEREFORE, Alison Clark seeks all relief available under 42 U.S.C. § 1983, including compensatory damages, punitive damages against the individual defendants, attorney fees, costs, and equitable relief.

**COUNT 7: OKLAHOMA STATE NEGLIGENCE CLAIM**

138. Plaintiff M.C. incorporates the above and foregoing statements and allegations as if fully stated herein.

139. The elements of negligence are: (1) the existence of a duty on the part of the defendant to protect the plaintiff from injury; (2) breach of that duty; and (3) injury proximately resulting therefrom. *Dirickson v. Mings*, 1996 OK 2, ¶ 7, 910 P.2d 1015, 1018.

140. At all relevant times, Defendant Canton Public Schools, Marisa Evans, and Sean Weibling owed M.C. a duty to exercise ordinary care for her safety, welfare, supervision, and educational environment while she was attending school and participating in school-sponsored activities.

141. Defendants knew that C.S. had made repeated threats of violence toward M.C., her family members, and other students.

142. Defendant knew that criminal charges had been filed against C.S. arising from such threats.

143. Defendants knew that M.C. was the identified victim of the threats and that she suffered from documented disabilities requiring accommodations.

144. Defendants owed a duty to act reasonably under the circumstances to protect students from foreseeable harm.

145. Defendants breached its duties by, among other things, through the following actions undertaken by the Defendants: (a) returning C.S. to campus despite knowledge of the danger; (b) failing to provide promised notice of C.S.'s return to campus; (c) refusing reasonable alternative educational arrangements which were allowed under school policy; (d) refusing available remote-learning options; (e) failing to adequately separate M.C. and C.S.; (f) failing to implement and enforce agreed upon accommodations; (g) failing to adequately supervise and monitor the circumstances involving C.S. and M.C.; (h) threatening truancy consequences despite known safety concerns; and (i) otherwise failing to exercise ordinary care under the circumstances.

146. Defendant knew or should have known that its conduct created a foreseeable risk of harm to M.C.

147. As a direct and proximate result of Defendant's negligence, M.C. suffered emotional injuries, educational injuries, physical injuries, neurological injuries, medical expenses, and other damages.

WHEREFORE, Plaintiffs seek all damages recoverable under Oklahoma law.

## COUNT 8: NEGLIGENT SUPERVISION AND RETENTION

148. Plaintiffs incorporate the above and foregoing statements and allegations as if fully stated herein.

149. The Oklahoma Court of Civil Appeals has stated that "…a claim for negligent supervision and training requires a showing that an employer met the three, preceding elements of negligence during the 'hiring, supervising, or retaining' of an employee." *Le v. Total Quality Logistics*, 431 P.3d 366, 375 (Okla. Civ. App. 2018). In a negligent supervision claim, an employer will be found liable if, "at the critical time of the tortious incident," the employer "had reason to believe that the [employee] would create an undue risk of harm to others" based upon the employer's "prior knowledge of the [employee's] propensity to commit the very harm for which damages are sought." *N.H. v. Presbyterian Church (U.S.A.)*, 1999 OK 88, ¶ 20, 998 P.2d 592, 600. In essence, an employer may bear liability of an employee's unreasonable or injurious conduct upon a third party if said conduct was reasonably foreseeable. *Schovanec v. Archdiocese of Oklahoma City*, 2008 OK 70, ¶ 40, 188 P.3d 158, 172, *Brown v. Muldrow Pub. Sch.*, 2024 OK CIV APP 20, ¶ 23, 557 P.3d 1063, 1074.

150. Defendant had a duty to reasonably supervise, train, and monitor administrators and employees responsible for student safety, disability accommodations, and implementation of educational policies.

151. Defendant knew or should have known that certain employees and administrators were failing to appropriately respond to the circumstances involving M.C. and C.S.

152. Defendant knew or should have known that agreed accommodations were not being consistently implemented.

153. Defendant knew or should have known that administrative decisions concerning M.C.'s safety and educational environment created a foreseeable risk of harm.

154. Defendant failed to reasonably supervise, train, correct, discipline, or otherwise address the deficiencies in its employees' performance.

155. Defendant's failures constituted a breach of its duties under Oklahoma law.

156. As a direct and proximate result of Defendant's negligent supervision and retention, Plaintiffs suffered the damages described herein.

WHEREFORE, Plaintiffs seek all damages recoverable under Oklahoma law.

**COUNT 9: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(M.C. v. Canton Public Schools and Individual Defendants)**

157. Plaintiff M.C. incorporate the above and foregoing statements and allegations as if fully stated herein:

158. At all relevant times, Defendants possessed actual knowledge that M.C. was the victim of repeated threats, intimidation, coercive control, and emotional abuse perpetrated by C.S.

159. Defendants possessed extensive documentary evidence of such conduct, including numerous threatening text messages and reports concerning C.S.'s behavior.

160. Defendants further knew that juvenile criminal charges had been filed against C.S. arising from the threatening conduct directed toward M.C. and others.

161. Defendants knew that M.C. suffered from disabilities, including Apraxia of Speech and Sensory Processing Disorder, making her particularly vulnerable to emotional and psychological harm.

162. Defendants knew that M.C. feared C.S. and that continued exposure to him would likely result in severe emotional distress.

163. Despite such knowledge, Defendants intentionally, recklessly, and with conscious disregard for M.C.'s wellbeing: (a) returned C.S. to campus under political pressure from his family and supporters; (b) failed to provide promised notice of his return; (c) refused available alternatives that would have separated M.C. from C.S.; (d) refused requests for remote educational placement allowed under policy; (e) threatened truancy consequences if M.C. did not attend school in person in close proximity to C.S.; (f) failed to implement and enforce effective accommodations; (g) required M.C. to continue attending school in close proximity to C.S.; and (h) ignored repeated warnings from M.C., her parents, legal counsel, and medical professionals regarding the consequences of their actions.

164. Defendants knew or recklessly disregarded the substantial certainty that their conduct would cause severe emotional distress to M.C. because of her known disabilities and the nature of the circumstances with and against C.S.

165. Defendants' conduct was extreme and outrageous, particularly given that M.C. was a minor child, a disabled student, and the known victim of threats and abuse made by C.S., who Defendants were forcing her to be in close proximity to, with only a closet to escape to if it became too much for M.C.

166. As a direct and proximate result of Defendants' conduct, M.C. suffered severe emotional distress far beyond that which a reasonable person could be expected to endure.

167. M.C.'s emotional distress manifested in significant psychological, physical, educational, and neurological injuries, including the development of a functional neurological disorder, seizures, episodes of unresponsiveness, loss of speech, hallucinations, hospitalization, ongoing medical treatment, and other serious consequences.

168. The severity of M.C.'s distress was foreseeable to Defendants and was in fact foreseen by Defendants through repeated warnings and communications concerning her deteriorating condition.

169. As a direct and proximate result of Defendants' outrageous conduct, M.C. suffered damages including emotional distress, physical injury, medical expenses, loss of educational opportunities, pain and suffering, and other compensable damages.

WHEREFORE, Plaintiff M.C. requests judgment against Defendants for compensatory damages, punitive damages against the individual defendants where permitted by law, costs, interest, and all other relief deemed just and proper.

**COUNT 10: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(Alison Clark v. Canton Public Schools, Sean Weibling, Marisa Evans)**

170. Plaintiff Alison Clark incorporates the above and foregoing statements and allegations as if fully stated herein:

171. Defendants possessed actual knowledge that Alison's daughter, M.C., was the victim of repeated threats, intimidation, coercive control, and emotional abuse by C.S.

172. Defendants knew that criminal charges had been filed against C.S. arising from his conduct toward M.C.

173. Defendants knew that M.C. suffered from documented disabilities and was experiencing significant emotional and educational difficulties as a result of Defendants' actions and omissions.

174. Defendants knew that Alison was acting as the primary advocate and caregiver for her daughter and was attempting to secure accommodations and protections necessary for M.C.'s safety and wellbeing.

175. Rather than addressing Alison's concerns in good faith, Defendants embarked upon a course of conduct intended to punish, silence, intimidate, and marginalize Alison because of her advocacy on behalf of M.C.

176. Defendants intentionally or recklessly engaged in conduct including: (a) ignoring or minimizing Alison's repeated concerns regarding student safety; (b) refusing reasonable requests for accommodations and alternative educational arrangements; (c) subjecting Alison to heightened scrutiny and criticism following her advocacy; (d) formally counseling and disciplining Alison for conduct that had previously been acceptable; (e) creating and fostering a hostile work environment; (f) professionally isolating Alison from colleagues and administrators; (g) demoting Alison despite her exemplary performance record and highly effective evaluation; (h) publicly posting her position and seeking her replacement before informing her of the decision to demote her; (i) replacing Alison with an inexperienced and uncertified individual while claiming the action was intended to improve competitiveness; and (j) continuing such conduct while knowing Alison was witnessing the severe deterioration of her daughter's health.

177. Defendants knew or recklessly disregarded the substantial certainty that their conduct would cause severe emotional distress to Alison.

178. Defendants' conduct was not limited to ordinary employment disputes, personnel decisions, or workplace disagreements. Defendants exploited Alison's unique vulnerability as the mother of a disabled child who was suffering significant emotional, educational, physical, and neurological consequences from circumstances known to Defendants.

179. Defendants' actions were extreme and outrageous, particularly because they were directed at a parent advocating for the safety and rights of her child, while watching her daughter’s health and well-being deteriorate.

180. As a direct and proximate result of Defendants' conduct, Alison suffered severe emotional distress beyond that which a reasonable person could be expected to endure.

181. Alison experienced anxiety, humiliation, mental anguish, emotional suffering, loss of professional reputation, deterioration in her own mental health, loss of employment, loss of income, and other damages.

182. The severity of Alison's distress was foreseeable to Defendants and was in fact foreseen by Defendants given Alison's repeated communications concerning M.C.'s condition and the impact Defendants' actions were having upon her family.

183. As a direct and proximate result of Defendants' outrageous conduct, Alison suffered damages including emotional distress, economic losses, reputational harm, pain and suffering, and other compensable damages.

WHEREFORE, Plaintiff Alison Clark requests judgment against Defendants for compensatory damages, punitive damages against the individual defendants were permitted by law, costs, interest, and all other relief deemed just and proper. **A jury trial is demanded on all causes of action alleged in this Complaint.**

Dated: June 12, 2026.

Respectfully submitted,

s/Stephen Jones
Stephen Jones, OBA #4805
William Jewell, OBA #34376
Blake Trekell, OBA #36282
JONES, OTJEN & JEWELL
214-A N. Independence St.
Post Office Box 472
Enid, OK 73702
Phone: (580) 242-5500
Fax: (580) 242-4556
Email:
sjones@stephenjoneslaw.com
wjewell@stephenjoneslaw.com
btrekell@stephenjoneslaw.com

*Counsel for Plaintiffs,*
*Alison Clark and M.C.*